FILED
U.S. District Court
Northern District of Iowa
August 4, 2003
By:des
Copies mailed/faxed to counsel of record, pro se parties
and others listed here:

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

IOWA PROTECTION AND
ADVOCACY SERVICES, INC.,

        Plaintiff,

vs.

GERARD TREATMENT PROGRAMS,
L.L.C.,

        Defendant.

No. C 01-3013-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING PLAINTIFF'S
MOTION FOR CONTEMPT**

---

## TABLE OF CONTENTS

*I.*  *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *A.* *Prior Litigation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *B.*  *Factual Background To The Present Standoff* . . . . . . . . . . . . . . . . . . . . . 5
   *C.*  *IPAS's Motion For Contempt* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*II.*  *ARGUMENTS OF THE PARTIES* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   *A.*  *The Parties' Written Arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   *B.*  *The Parties' Oral Arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*III.*  *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   *A.*  *Standards For Contempt* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   *B.*  *Application Of The Standards* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
      *1.*    *Context of the demand for information* . . . . . . . . . . . . . . . . . . 18
      *2.*    *Are the requested disclosures required by the Final Order?* . . . . . . 19
         *a.*    *Does ¶ 5 of the Final Order require the requested
            disclosures?* . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
         *b.*    *Does ¶ 1 of the Final Order require the requested
            disclosures?* . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
             *i.*    *Incorporation of 42 C.F.R. § 51.42(e)* . . . . . . . . . 23

          **ii.**       **Incorporation of 42 U.S.C. §§ 1080 and 15043** . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

     **3.**     **Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**IV. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

The plaintiff advocacy agency has filed a motion for contempt in this action premised on the refusal of the defendant psychiatric institution for children to provide a list of the residents of the institution along with the names and addresses of the residents' respective guardians or other legal representatives. The advocacy agency contends that the institution's conduct is not only contrary to federal statutes and regulations, but contrary to a final order entered in this action by this court, which enjoined the psychiatric institution from preventing or interfering with access by the advocacy agency to the residents, records of residents, and facilities of the institution, as provided by federal law, and specified the conditions under which the institution is required to provide the advocacy agency with certain kinds of access to residents and records. The institution, however, contends that the advocacy agency has failed to cite any provision of this court's final order, a federal statute, or a federal regulation that would require the institution to disclose the requested information. Moreover, the institution contends that state and federal laws actually bar it from disclosing such information. In response, the advocacy agency contends that any state-law bars on disclosures are preempted by its governing statutes and that its demand for disclosures falls within exceptions stated in federal statutes that the institution raises as a bar.

Case 3:01-cv-03013-MWB   Document 41   Filed 08/04/03   Page 2 of 29

# I. INTRODUCTION

## A. Prior Litigation

In this action, plaintiff Iowa Protection and Advocacy Services, Inc. (IPAS), originally asserted that defendant Gerard Treatment Programs, L.L.C. (Gerard), a psychiatric institution for children, had denied or interfered with IPAS's access to information essential to its investigation of the death of one resident of Gerard's treatment facility in Mason City, Iowa, and IPAS's determination that there was probable cause to believe that other residents of the Gerard facility were in jeopardy of abuse or neglect. IPAS asserted that Gerard's conduct violated the Protection and Advocacy for Mentally Ill Individuals Act of 1986, as amended in 1991 (PAMII Act), 42 U.S.C. § 10801 *et seq.*, and the "Protection and Advocacy of Individual Rights" provision of the Developmental Disabilities Act of 1984, as amended (DDA), 42 U.S.C. § 6042, since repealed, revised, and recodified at 42 U.S.C. § 15043.

Eventually, on July 17, 2001, this court entered a Preliminary Injunction enjoining Gerard from preventing or interfering with access by IPAS to the residents, records of residents, and facilities of Gerard's Mason City facility, as provided by federal law, and specifying the conditions under which Gerard was required to provide IPAS with certain kinds of access to residents and records. *See Iowa Protection and Advocacy Services, Inc. v. Gerard Treatment Programs*, L.L.C., 152 F. Supp. 2d 1150 (N.D. Iowa 2001); *see also Iowa Protection and Advocacy Services, Inc. v. Gerard Treatment Programs, L.L.C.*, 2001 WL 34008485 (N.D. Iowa July 17, 2001) (slip op.) (lifting stay on preliminary injunction). The parties then worked toward an agreement on the language of a Final Order, proposed by the court, that would be dispositive of the case. The court ruled on the few disputes about proposed language of the Final Order that the parties were unable to resolve and entered its Final Order in this case on June 14, 2002. *See* Final Order.

The portions of the June 14, 2002, Final Order that IPAS contends are pertinent here

3

are the following:

>**DEFENDANT GERARD TREATMENT PROGRAMS, L.L.C. (GERARD)** is hereby **permanently enjoined**, as follows:
>
>>**1.** Gerard is permanently enjoined from preventing or interfering with IPAS's access, as provided by federal law, to residents, records of residents, and facilities located at Gerard in Mason City, Iowa.
>>
>>\* \* \*
>>
>>**5.** **Monitoring and other activities**. Within twenty-four hours of written request for access, which shall identify the purpose of such access, Gerard shall provide IPAS with reasonable unaccompanied access to residents, facilities, and programs for the purposes of providing information and training and referral to programs of IPAS; providing information and training on rights of residents; monitoring compliance with respect to the rights and safety of residents; inspecting, viewing, and photographing all areas of the facility which are used by residents or are accessible to residents; and any other activity of IPAS authorized by law. Such access shall be made with respect to residents' privacy interests and IPAS shall honor a resident's request to terminate an interview.
>>
>>\* \* \*
>>
>>**7.** **Binding effect**. This permanent injunction shall be binding on the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this order.

Final Order at ¶¶ 1, 5 & 7. Judgment was entered pursuant to the Final Order, *see* Judgment (docket no. 34), and there, to all appearances from the docket, the matter rested until early 2003.

### B. Factual Background To The Present Standoff

The present standoff between the parties began with a letter dated January 29, 2003, from counsel for IPAS to Larry Elphic, the Executive Director of Gerard's facility in

4

Mason City, Iowa.  Plaintiff's Exhibit B.  That letter was captioned "Re:  Request for List of Residents and Guardians."  *Id.*  In pertinent part, the letter stated the following:

> In accordance with Iowa Protection and Advocacy Services, Inc.'s federal mandate to protect and advocate for the human and legal rights of 1) persons with disabilities under the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (PADD), 42 U.S.C. § 15001 *et. seq.*, 2) persons with mental illness under the Protection and Advocacy for Mentally Ill Act of 2000 (PAIMI), 42 U.S.C. § 10801 *et. seq.*, and 3) persons with disabilities under the Protection and Advocacy of Individual Rights Act (PAIR), 29 U.S.C. § 794e., and the regulations thereunder, our agency requests that you promptly provide a detailed listing of current residents at your facility, along with the names and addresses of their respective legal guardian or other legal representatives.

*Id.*  Gerard's Executive Director, Larry Elphic, apparently responded to this letter by telephone.  During the telephone conversation, Gerard contends that Mr. Elphic asked IPAS's counsel for a statement of IPAS's claimed authority to demand the requested information.  While IPAS's counsel admits that the telephone call occurred, she avers in her affidavit in support of IPAS's reply that Mr. Elphic indicated that he thought that the list of guardians would likely be produced.

Whatever the precise details of the telephone call on February 12, 2003, IPAS's counsel sent Mr. Elphic another letter, this time by e-mail, on February 12, 2003.  *See* Plaintiff's Exhibit C.  That e-mail identified the statutory authority, federal and state, for IPAS, as a non-profit advocacy agency, to investigate incidents of abuse and neglect of individuals with disabilities and mental illnesses, and to monitor facilities and programs for such individuals, as well as regulations detailing the "information and individual records" that must be made available to an advocacy agency such as IPAS under various circumstances.  *See id.* at 2-3.  However, the portions of the letter that appear to the court to attempt to identify IPAS's specific authority to demand the information in question

5

here—lists of residents and the names and addresses of their guardians or legal representatives—are the final paragraphs, which state the following:

> Under the statutes and regulations, Iowa P & A must attempt to notify parents or legal guardians that they may be conducting these investigations or monitoring activities, when access to their child and/or their records is potentially at issue. See, 42 U.S.C. § 15043; 42 U.S.C. § 10805; and specifically 42 C.F.R. § 51.42(e), which provides:

>> The system shall make [e]very [sic] effort to ensure that the parents of minors or guardians of individuals in the care of a facility are informed that the system will be monitoring activities at the facility and may in the course of such monitoring have access to the minor or adult with a legal guardian.

> See, also *Iowa Protection and Advocacy Services, Inc. v. Gerard*, 152 F. Supp. 2d 1150 (S.D. Ia 2001) [sic: N.D. Iowa].

> This broad right of access applies despite the existence of any state or local laws or regulations which attempt to restrict the access: although state law may expand the authority of the P & A, state law cannot diminish the authority set forth in the federal statutes. 45 C.F.R. § 1386.21(f) (2001), 42 C.F.R. § 51.31(i) (2001), and 42 C.F.R. § 51.42(e) (2001). Therefore, by virtue of the Supremacy Clause of the United States Constitution, any state law restricting Iowa P & A'S access to the records requested is expressly preempted by the PADD and PAIMI acts. As the Court emphasized in *Iowa Protection and Advocacy Services, Inc. v. Rasmussen, et. al.*, 206 F.R.D. 630, 640 (S.D. Ia 2001) the independent check provided by the investigatory powers and rules of disclosure set forth in the federal mandates "would become meaningless if a state was allowed to simply legislate away a protection and advocacy system's power to investigate by enacting restrictions." Refusing to provide the individual identities of

6

clients and their legal guardians would be precisely the type of restriction, which is prohibited under the statute and its supporting regulations.

The information that we have requested by my letter is both authorized and made necessary as outlined in our federal mandate. If you have any additional questions, or would like to discuss this further, feel free to give me a call. I appreciate your cooperation.

*Id.* at 3-4.

At about the time that IPAS was demanding the information in question from Gerard, Gerard contends that its Executive Director, Mr. Elphic, became aware that IPAS had requested similar information from other Iowa psychiatric medical institutions for children. Gerard contends that Mr. Elphic entered into discussions with the directors of those other institutions concerning whether IPAS was authorized to demand such information and whether the institutions could legally provide such information. Gerard maintains that Mr. Elphic notified IPAS's counsel by e-mail that he would let IPAS's counsel know when the "group" had reached a consensus. Although there is scant support for Gerard's contentions in the record, what is clear from the record is that, on February 14, 2003, IPAS's counsel e-mailed Mr. Elphic informing him that IPAS had received the requested information from two other psychiatric medical institutions and asking if these responses indicated the consensus of the "group," or merely individual responses. *See* Plaintiff's Exhibit D. On February 22, 2003, Mr. Elphic responded to that query by explaining that he had shared the letter that he had received from IPAS with the members of the "group" and that "[a]s soon as the coalition comes to some form of conclusion I will respond as to what I believe is in Gerard's best interest." *Id.* Mr. Elphic also asked, "Have you considered going the alternative route of requesting this information from the state?" *Id.*

Although Gerard does not indicate how it did so, Gerard contends that it informed IPAS in late February 2003 that, based on the opinion of counsel for other institutions, the

7

group of directors of such institutions had concluded that IPAS had no legal authority to request the information it was demanding and that institutions such as Gerard had no legal authority to provide such information. In support of this position, Gerard now offers letters from counsel for two other institutions to IPAS. *See* Defendant's Exhibits A & B. The court finds that Gerard declined to make the requested disclosures in February 2003; why, when, and how precisely Gerard made known to IPAS that it would not be making the requested disclosures, apart from the lack of any evidence that the disclosures were ever made, cannot be determined from the present record.

The parties did not provide the court with any other evidence of communications between them regarding this issue until June 2003. On June 11, 2003, IPAS's counsel sent Mr. Elphic a letter notifying Gerard that IPAS would be "conducting a routine monitoring of" Gerard's facility in Mason City that day. Plaintiff's Exhibit E. Gerard maintains that the letter was delivered when two representatives of IPAS appeared unannounced at Gerard's Mason City facility. The affidavits of IPAS's counsel and one of its investigators in support of IPAS's reply also indicate that the letter was hand-delivered by IPAS's investigators on June 11, 2003. The record reveals that IPAS's investigators were admitted to Gerard's facility on June 11, 2003. However, the June 11, 2003, letter did not renew IPAS's request for a list of residents or the names and addresses of their legal guardians or legal representatives. Nevertheless, the parties do not appear to dispute that IPAS's representatives did request that information during their visit. Although there is some dispute as to what IPAS's representatives were or were not allowed to do during their visit on June 11, 2003, there is no dispute that Gerard officials declined to provide the information in question here, either then or later.

On June 12, 2003, IPAS's counsel faxed Gerard a letter notifying Gerard that IPAS intended to conduct further "routine monitoring" of Gerard's Mason City facility on June 13, 2003. *See* Defendant's Exhibit C. Again, this letter made no request for a list of

8

residents or the names and addresses of their legal guardians or legal representatives. However, Gerard maintains that, on the morning of June 13, 2003, Mr. Elphic telephoned IPAS's counsel to inform her that such information would not be provided to IPAS's representatives and that Gerard's counsel in Minneapolis would instead be sending her a letter informing IPAS of Gerard's legal position regarding disclosure of such information to IPAS.

Although record evidence concerning the purported telephone call on June 13, 2003, is scant, the record does show that, by letter dated June 13, 2003, Gerard's counsel in Minneapolis informed counsel for IPAS of Gerard's position on various issues concerning IPAS's access to Gerard's facility, residents, and records. *See* Defendant's Exhibit D. In the part of that letter pertinent to the issues presented in IPAS's motion for contempt, Gerard's counsel in Minneapolis stated the following:

> As to the request to review children's files and for a list of residents and parents or guardians, we are unfamiliar with any provisions of the Federal Regulations or the Order which require the production of such information for P & A monitoring purposes. On the other hand, we are familiar with state and federal laws which prohibit the release of such information without proper consent. If you can refer us to some legal authority which specifically entitles your organization to receive such information for monitoring the [sic] purposes, we will carefully consider it. In the absence of such information, however, Gerard is compelled to decline your request for such information at this time. Should the circumstances or the purpose of your request change, Gerard will carefully evaluate any such request in light of the circumstances and the applicable law and respond within the time frame set by Judge Bennett's order.

*Id.* at 2.

On June 25, 2003, IPAS's counsel faxed Gerard and Gerard's Minneapolis counsel another letter requesting that Gerard provide a list of residents and the names and addresses

9

of their respective guardians or legal representatives. *See* Plaintiff's Exhibit F. The letter was not, however, sent to the attorneys in Mason City who had represented Gerard previously in this action. The only additional authority for IPAS's request stated in the June 25, 2003, letter was the following:

> Under the Gerard Order [*i.e.*, the Final Order in this case], "within twenty-four hours of written request for access," Gerard must provide access for, among other things, specifically listed, "any other activity of IPAS authorized by law." (Gerard order at pages 4 and 5). Our request for the list [of residents and their legal guardians or representatives] is authorized by the regulations implementing our mandate. Your continued refusal to provide us with a list of the residents and their guardians directly interferes with our ability to carry out our responsibility under those laws.

*Id.* at 4. As Gerard points out, this letter did not notify Gerard of IPAS's intent to file a motion for contempt. Instead, the letter stated an intention to seek an order compelling the requested disclosures, as follows:

> Once again, we are requesting a list of the parents or other legal guardians of the residents at the Gerard facility so that we can provide notice to them prior to conducting further monitoring activities at your facility. Your continued and persistent failure to provide this list will leave us no choice but to seek an order from the federal court compelling the same. I look forward to receiving a copy of the requested information within the 24 hour time frame provided by the prior Gerard order.

*Id.* Gerard maintains that its Minneapolis counsel received IPAS's motion for contempt by overnight courier on June 30, 2003. Gerard contends that it had no opportunity, between June 25, 2003, and the filing of IPAS's motion for contempt, to seek a clarification from this court of Gerard's obligation or lack thereof to provide IPAS with the list of residents and the names and addresses of their legal guardians or legal representatives under either the terms of the Final Order or other federal law or regulations.

10

On July 2, 2003, Gerard's Minneapolis counsel faxed a letter to IPAS demanding that the motion for contempt be withdrawn and offering to discuss alternative ways for IPAS to inform parents and guardians of Gerard residents of IPAS's services and IPAS's intent to conduct monitoring visits that would not require Gerard to provide IPAS with the disputed information. *See* Defendant's Exhibit E. However, the parties have not resolved their dispute about IPAS's entitlement to the information that IPAS is demanding.

### C. IPAS's Motion For Contempt

This matter is now before the court pursuant to IPAS's June 30, 2003, motion (docket no. 35) for contempt of the June 14, 2002, Final Order. IPAS's motion is based on Gerard's refusal to provide a list of the residents of the institution along with the names and addresses of the residents' respective guardians or other legal representatives. Gerard resisted IPAS's motion for contempt on July 14, 2003, and IPAS filed a reply on July 21, 2003. IPAS subsequently submitted by letter a citation to a case, *Forest Park II v. Hadley*, ___ F.3d ___, ___, 2003 WL 21664818 (8th Cir. July 17, 2003), regarding preemption of state laws by federal laws, albeit in a different context from that presented here, upon which IPAS intended to rely in its arguments.

By order dated July 7, 2003, this court set IPAS's motion for contempt for oral arguments on July 24, 2003. At those oral arguments, plaintiff IPAS was represented by Suzie A. Berregaard, Staff Attorney for IPAS in West Des Moines, Iowa. Defendant Gerard was represented by Rustin Davenport of De Vries, Price & Davenport in Mason City, Iowa, and Mark Manderfeld of Mahoney, Dougherty, Mahoney in Minneapolis, Minnesota. IPAS's motion for contempt is now fully submitted on the written record and the written and oral arguments of the parties.

11

## II. ARGUMENTS OF THE PARTIES

### A. The Parties' Written Arguments

IPAS contends that the requested information is necessary for IPAS to fulfill its obligation under 42 C.F.R. § 51.42(e) to attempt to notify parents or legal guardians that IPAS may be conducting monitoring activities at Gerard and may, in the course of such monitoring, have access to residents or their records. In light of IPAS's clearly defined notification obligation, IPAS contends that Gerard's repeated refusal to provide a list of residents and their guardians directly interferes with IPAS's mandate under federal law, demonstrating its contempt of court. However, IPAS's opening brief did not identify the precise portions of the court's Final Order in this case that would purportedly require Gerard to make the requested disclosures.

Gerard does not dispute that IPAS asked Gerard for a list of the names of Gerard's residents and a list of the names and addresses of the parents and guardians of those residents, nor does Gerard dispute that it has refused to provide such information to IPAS. Rather, Gerard disputes IPAS's contention that IPAS has a legal right to such information as part of its "monitoring" functions under federal law or regulations. Moreover, Gerard disputes that its refusal to provide IPAS with such information is in violation of, let alone contempt of, any provision of the court's June 14, 2002, Final Order. Finally, Gerard contends that state and federal laws actually bar it from disclosing the information that IPAS is demanding.

In its reply, IPAS contends that Gerard's resistance relies on a host of "facts" unsupported by the record and that Gerard's statement of what occurred in the first half of 2003 is otherwise irrelevant, misleading, or inaccurate. IPAS's reply clarifies that "[t]he only issue raised by IPAS in its Motion for Contempt challenges Gerard's denial of access to a list of guardian(s) or other legal representative for residents in their facility." IPAS's Reply at 2. Nevertheless, in its reply, IPAS also contends that the focus of its motion for

contempt is *not* an indication that IPAS agrees that Gerard otherwise complied with applicable law or this court's Final Order. Furthermore, IPAS provides affidavits of its counsel and one of its investigators disputing various factual contentions that Gerard has made regarding the matters at issue here and IPAS's attempts to conduct "monitoring" activities at Gerard's Mason City facility during the first half of 2003. However, IPAS's reply does not identify any further authority—either provisions of this court's Final Order or other applicable statutes or regulations—in support of IPAS's contention that Gerard is required to disclose the information that IPAS has demanded.

## B. The Parties' Oral Arguments

At the oral arguments on July 24, 2003, IPAS made clear that it is relying on the interplay between the first numbered paragraph of the Final Order, which enjoins Gerard from preventing or interfering with IPAS's access, *as provided by federal law*, to residents, records of residents, and facilities located at Gerard in Mason City, Iowa, *see* Final Order at ¶ 1, and a federal regulation, which requires IPAS to make every effort to ensure that residents' guardians are notified that IPAS will be monitoring activities at Gerard and may in the course of such monitoring have access to the residents. *See* 42 C.F.R. § 51.42(e). IPAS's key contention is that the notification obligation imposed upon it by 42 C.F.R. § 51.42(e) imposes a concomitant duty upon Gerard to disclose the information that IPAS needs to fulfill its notification obligation; otherwise, IPAS contends, Gerard is "preventing or interfering" with IPAS's obligation to notify guardians about monitoring activities in violation of paragraph 1 of the Final Order. IPAS argues, further, that any state law upon which Gerard relies as barring it from making the disclosures implicitly—if not explicitly—required by 42 C.F.R. § 51.42(e) is preempted, under the Supremacy Clause, by IPAS's express notification obligation under its controlling statutes. IPAS also argues that, as a matter of policy, it could not have been the intent of Congress that IPAS would

13

have to look around for some other source of the information it requires to fulfill its notification obligation, where the burdens of doing so for every institution that IPAS has authority to monitor are substantial.

On the other hand, at the oral arguments, Gerard made clear that its position is that the plain language of the regulation simply imposes no disclosure duty at all upon Gerard. Gerard contends that it is not "preventing or interfering" with IPAS's access, as provided by federal law, where no federal law requires it to make the disclosures that IPAS is demanding. On the other hand, Gerard argues that IPAS can satisfy its notification obligation by providing information to Gerard to forward to the legal guardians of its residents, either at the time that residents first arrive at the institution, or at other times. Gerard points out that the regulation does not specify that the notice must be given *every time* IPAS undertakes a "monitoring" visit to Gerard's facility, so that notification of IPAS's possible monitoring activities when residents first enter the institution would fulfill IPAS's notification obligation.

IPAS, however, contends that it would be improper for it to delegate fulfillment of its notification obligation in the way that Gerard suggests and that it would be improper to give Gerard any authority over the information that IPAS provides in fulfillment of its notification obligation. IPAS emphatically asserts that it will not accept Gerard's interpretation of what would fulfill IPAS's notification obligation. IPAS also asserts that a decision by this court that Gerard is not compelled to provide the information necessary for IPAS to fulfill its notification obligation would have very broad consequences for the entire scheme of "monitoring" by advocacy agencies, imposing upon such agencies huge burdens that clearly are not what Congress intended.

14

### III.  LEGAL ANALYSIS

#### A.  Standards For Contempt

The court takes up, first, the standards for finding a party in civil contempt of a court order.  "Civil contempt may be employed either to coerce the defendant into compliance with a court order or to compensate the complainant for losses sustained, or both."  *Chicago Truck Drivers v. Brotherhood Labor Leasing*, 207 F.3d 500, 505 (8th Cir. 2000).  "The party moving for contempt sanctions bears the burden of proving facts warranting a civil contempt order by clear and convincing evidence."  *Id.* at 504.  The appellate courts review a district court's finding of civil contempt for abuse of discretion.  *International Bhd. of Electrical Workers, Local Union No. 545 v. Hope Electrical Corp.*, 293 F.3d 409, 415 (8th Cir. 2002) (*I.B.E.W.*); *Chicago Truck Drivers*, 207 F.3d at 504.

More specifically, as to the potency of the court's contempt power, the special nature of the applicable "abuse of discretion" review, and the circumstances in which a finding of contempt is appropriate, the Eighth Circuit Court of Appeals recently explained,

> As this Court has stated:
>
>> 'The contempt power is a most potent weapon, and therefore it must be carefully and precisely employed.'  *Mahers v. Hedgepeth*, 32 F.3d 1273, 1275 (8th Cir. 1994).  Thus, although we review both the grant and denial of a contempt order for abuse of discretion, *see Wright v. Nichols*, 80 F.3d 1248, 1250 (8th Cir. 1996) (reviewing criminal contempt order); *Wycoff v. Hedgepeth*, 34 F.3d 614, 616 (8th Cir. 1994) (reviewing denial of contempt), we review an order of contempt more searchingly, *see Mahers*, 32 F.3d at 1275.
>
> *Independent Fed'n of Flight Attendants v. Cooper*, 134 F.3d 917, 920 (8th Cir. 1998).  Nevertheless, in this "searching" review for abuse of discretion, this Court need not hesitate to affirm a contempt order where a party has appropriated for its own wielding the power to determine the validity of court orders.

15

> One of the overarching goals of a court's contempt
> power is to ensure that litigants do not anoint themselves
> with the power to adjudge the validity of orders to which
> they are subject. The Supreme Court has observed that,
> without the contempt power, 'what the Constitution now
> fittingly calls the judicial power of the United States
> would be a mere mockery.'
>
> *Chicago Truck Drivers v. Brotherhood Labor Leasing*, 207 F.3d
> 500, 504 (8th Cir. 2000) (citing *United States v. United Mine
> Workers*, 330 U.S. 258, 290 n. 56, 67 S. Ct. 677, 91 L.Ed. 884
> (1947)).

*I.B.E.W.*, 293 F.3d at 415; *accord Imageware, Inc. v. U.S. West Communications*, 219 F.3d
793, 797 (8th Cir. 2000) ("Contempt of court is a serious matter, even civil contempt.").

More concretely, "[a]s a general matter, when a litigant refuses to respect the
authority of the court, it is not an abuse of discretion for the court to hold the litigant in
contempt and impose a sanction to coerce compliance." *Id.* at 418. However, "contempt
orders must be based upon a party's failure to comply with a clear and specific underlying
order, and . . . the contempt order must specifically identify those actions necessary to
bring a contemnor into compliance." *Id.* (citing *International Longshoremen's Ass'n, Local
1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 74-75, 88 S. Ct. 201, 19 L. Ed. 2d
236 (1967)); *Imageware, Inc.*, 219 F.3d at 797 ("No one should be held in contempt for
violating an ambiguous order. . . . A contempt should be clear and certain."). Therefore,
if the underlying order in the case "contained no operative commands, contained only
abstract legal conclusions, or compelled no action," a finding of contempt for failing to
comply with the terms of the order would be an abuse of discretion. *Id.* Similarly, if the
alleged contemnor could "reasonably, even if perhaps erroneously, have believed" that his
conduct was permitted by the underlying order, a finding of contempt would be an abuse of
discretion. *Imageware, Inc.*, 219 F.3d at 797.

On the other hand, if these requirements for the content and clarity of the underlying

order have been met, then "[o]nce it has been shown that the alleged contemno[r] violated a court order, the contemnor bears the burden of showing that compliance is presently impossible." *United States v. Santee Sioux Tribe of Nebraska*, 254 F.3d 728, 736 (8th Cir. 2001) (citing *Chicago Truck Drivers*, 207 F.3d at 505). "To show that compliance is presently impossible, the defendant must demonstrate: '(1) that they were unable to comply, explaining why categorically and in detail, (2) that their inability to comply was not self-induced, and (3) that they made in good faith all reasonable efforts to comply.'" *Id.* (again citing *Chicago Truck Drivers*, 207 F.3d at 506, with internal quotes and citations omitted).

### B. Application Of The Standards

#### 1. Context of the demand for information

As a preliminary matter, the court finds that IPAS seeks a finding of contempt only on the basis of Gerard's refusal to provide IPAS with a list of the residents of the institution along with the names and addresses of the residents' respective guardians or other legal representatives; IPAS does not seek a finding of contempt on the basis of any other conduct of Gerard during or in relation to IPAS's activities at Gerard's Mason City facility during the first half of 2003. Indeed, IPAS makes precisely this admission concerning the basis for its contempt motion in its reply. *See* IPAS's Reply at 2 ("The only issue raised by IPAS in its Motion for Contempt challenges Gerard's denial of access to a list of guardian(s) or other legal representative for residents in their facility.").

Also as a preliminary matter, the court finds that IPAS demanded the information in question in the course of "monitoring" activities, not in the course of "investigative" activities or any other activities authorized by law. This second finding is based primarily on IPAS's own correspondence during the course of the parties' dispute. The court acknowledges that a broader context may be suggested in IPAS's initial demand letter, dated

17

January 29, 2003, which included a demand for the information in question "[i]n accordance with [IPAS's] federal mandate to protect and advocate for the human and legal rights of [persons covered by the PADD, PAIMI, and PAIR]." *See* Plaintiff's Exhibit B. However, this statement of authority for the demand in the January 29, 2003, letter is so general—*e.g.*, in that it fails to identify any *specific* provision of a statute, regulation, or this court's Final Order, or any *specific* activity under way or intended by IPAS—that it does not indicate whether the information is sought pursuant to either IPAS's "investigative" or "monitoring" authority. *See generally Iowa Protection & Advocacy Serv.*, 152 F. Supp. 2d at 1158-59 (noting that advocacy agencies have the authority, under specific statutory provisions, to perform "investigative" and "monitoring" functions). On the other hand, subsequent demands for the information were made in the context of visits to Gerard's Mason City facility for what IPAS itself described as "monitoring" activities. *See, e.g.,* Plaintiff's Exhibits E (letter dated June 11, 2003, from IPAS hand-delivered by IPAS representatives when they appeared to visit Gerard's facility); Defendant's Exhibit C (letter dated June 12, 2003, from IPAS). Moreover, the specific regulation that IPAS asserts requires Gerard to disclose the information in question here, 42 C.F.R. § 51.42(e), is a regulation requiring IPAS to attempt to notify parents and legal guardians that IPAS will be conducting "monitoring activities." 42 U.S.C. § 51.42(e). Finally, IPAS does not contend that it was seeking the information in the context of any "death" or "probable cause" investigation, or even that it was attempting or planning to conduct any such "death" or "probable cause" investigation.

### 2. Are the requested disclosures required by the Final Order?

The burden here is on IPAS, as the complaining party, to "prov[e] facts warranting a civil contempt order by clear and convincing evidence." *Chicago Truck Drivers*, 207 F.3d at 505. Therefore, IPAS must prove that Gerard "fai[led] to comply with a clear and specific underlying order." *I.B.E.W.*, 293 F.3d at 418. In other words, IPAS must show

18

that the June 14, 2002, Final Order in this case *clearly and specifically* requires Gerard to provide IPAS with a list of the residents of the institution along with the names and addresses of the residents' respective guardians or other legal representatives so that IPAS can fulfill its obligation to notify such guardians and representatives that IPAS will be conducting "monitoring" activities at the Gerard facility. This IPAS cannot do. Indeed, nowhere in its briefs in support of the motion for contempt does IPAS even attempt to identify a provision of the Final Order that, standing alone, requires such disclosures.

However, somewhat belatedly in the course of the parties' dispute—in the letter that IPAS's counsel faxed to Gerard and Gerard's Minneapolis counsel on June 25, 2003— IPAS asserted that language in numbered paragraph 5 of the Final Order requires the disclosures that it is demanding. Also, in the course of oral arguments, IPAS's counsel clarified that it is IPAS's contention that the disclosures in question are required by the interplay between numbered paragraph 1 of the Final Order and certain federal statutes and regulations. The court will explore whether either of these paragraphs of the Final Order *clearly and specifically* requires the disclosures that IPAS is demanding.

### a. Does ¶ 5 of the Final Order require the requested disclosures?

In the letter that IPAS's counsel faxed to Gerard and Gerard's Minneapolis counsel on June 25, 2003, IPAS asserted that the Final Order provides that "'within twenty-four hours of written request for access,' Gerard must provide access for, among other things, specifically listed, 'any other activity of IPAS authorized by law.'" *See* Plaintiff's Exhibit F (citing the Final Order at pages 4 and 5). The quoted language of the Final Order actually appears in numbered paragraph 5, which is entitled "Monitoring and other activities." *See* Final Order at ¶ 5. IPAS opined in its June 25, 2003, letter that its "request for the list [of residents and their legal guardians or representatives] is authorized by the regulations implementing our mandate," such that Gerard's "continued refusal to provide us with a list of the residents and their guardians directly interferes with our ability to carry out our

19

responsibility under those laws." *Id.* The court concludes, however, that IPAS has tried to make bricks with too little straw.

The paragraph from which the language relied on by IPAS is cribbed states, in its entirety, the following:

> **5. Monitoring and other activities**. *Within twenty-four hours of written request for access*, which shall identify the purpose of such access, *Gerard shall provide IPAS with reasonable unaccompanied access to residents, facilities, and programs for* the purposes of providing information and training and referral to programs of IPAS; providing information and training on rights of residents; monitoring compliance with respect to the rights and safety of residents; inspecting, viewing, and photographing all areas of the facility which are used by residents or are accessible to residents; and *any other activity of IPAS authorized by law.* Such access shall be made with respect to residents' privacy interests and IPAS shall honor a resident's request to terminate an interview.

Final Order at ¶ 5 (emphasis added). What is clear from the statement of this paragraph, in its entirety—as opposed to the selected clauses upon which IPAS relied in its June 25, 2003, letter—is that the paragraph does not require disclosure of any information whatsoever, or even access to Gerard's *records* about residents or their legal guardians. Rather, it requires "Gerard [to] provide IPAS with reasonable unaccompanied access *to residents, facilities, and programs*," whatever IPAS's purpose in seeking such access. *Id.* (emphasis added).

The portions of the Final Order that specify IPAS's right of access to "records," which might arguably include the names of the residents and the names and addresses of the residents' legal guardians or legal representatives, are found in provisions of the Final Order that relate to investigation of the death of a resident, a determination of probable cause to believe that one or more residents of Gerard is in serious and immediate jeopardy, *see id.* at ¶ 2, or the investigation of a complaint or a determination of probable cause to believe

20

that one or more residents of Gerard are subject to abuse or neglect. *See id.* at ¶ 3. However, as the court found above, IPAS's request for the information in question was made in the context of IPAS's exercise of its authority to conduct "monitoring" activities; IPAS has not contended that it was denied the information in question in the context of any "investigation."

In light of the comparison above of what paragraph 5 of the Final Order actually requires and what IPAS is demanding, it is apparent that Gerard *has not* "fail[ed] to comply with a clear and specific underlying order" requiring disclosure of the information that IPAS demands. *See I.B.E.W.,* 293 F.3d at 418. Paragraph 5 of the Final Order simply "contained no operative commands" and "compelled no action" requiring the disclosure of the information that IPAS is demanding. *Id.* Thus, Gerard cannot be held in contempt of court for refusing to disclose the requested information on the basis of any supposed violation of paragraph 5 of the Final Order. *Id.*

### b. *Does ¶ 1 of the Final Order require the requested disclosures?*

The court's finding that Gerard has not violated the express terms of paragraph 5 of the Final Order does not put an end to the contempt inquiry, however. This is so, because of IPAS's contention—suggested in its correspondence with Gerard and expressly stated at the oral arguments on its motion for contempt—that paragraph 1 of the Final Order requires the disclosures in question. IPAS's argument runs as follows: Paragraph 1 of the Final Order permanently enjoins Gerard "from preventing or interfering with IPAS's access, *as provided by federal law*, to residents, *records of residents*, and facilities located at Gerard in Mason City, Iowa," *see* Final Order at ¶ 1 (emphasis added); a federal regulation, in turn, imposes upon IPAS an obligation to attempt to notify parents or guardians prior to conducting monitoring functions at Gerard and other facilities, *see* 42 C.F.R. § 51.42(e); therefore, Gerard is "preventing or interfering with" IPAS's access "as provided by federal law" by refusing to provide the information that IPAS needs to meet its notification

obligation under the regulation. Gerard, however, contends that it is not interfering with IPAS's access as provided by federal law where the federal regulation on which IPAS relies simply does not require Gerard to disclose the information in question. Thus, the court must determine whether federal law, as incorporated into paragraph 1 of the Final Order, requires Gerard to make the disclosures in question here.[1] Again, the court concludes that not only is there no regulatory support for IPAS's contention that Gerard is required to make the disclosures in question, there is also no statute that requires Gerard to produce a list of the residents of the institution along with the names and addresses of the residents' respective guardians or other legal representatives to aid IPAS in advising such guardians or representatives that IPAS might be conducting "monitoring" activities at Gerard's facility in Mason City.

     ***i.    Incorporation of 42 C.F.R. § 51.42(e)***. The centerpiece of IPAS's argument that federal law, and hence paragraph 1 of the Final Order, requires the disclosures at issue here is 42 C.F.R. § 51.42(e). That regulation provides, in pertinent part, as follows:

> The system shall make every effort to ensure that the parents of minors or guardians of individuals in the care of a facility are informed that the system will be monitoring activities at the facility and may in the course of such monitoring have access to the minor or adult with a legal guardian.

42 C.F.R. § 51.42(e). Plainly, the regulation is cast in terms of obligations imposed upon an *advocacy agency*, such as IPAS, not obligations imposed upon a psychiatric medical institution, such as Gerard. Thus, on its face, the regulation is silent about any responsibility of Gerard to produce the information demanded by IPAS.

------

[1]Moreover, to the extent that IPAS's motion for contempt can be construed as a motion to compel compliance with IPAS's demand for the information in question, the court must also consider whether any federal statute or regulation requires the disclosures that IPAS demands.

However, IPAS argues that the obligation imposed upon IPAS by this regulation necessarily requires the disclosures by Gerard that IPAS demands. Specifically, IPAS argues,

> IPAS has a clearly defined, affirmative responsibility under the regulations to attempt to notify parents or guardians prior to conducting monitoring functions at Gerard and other facilities. Gerard's repeated refusal to recognize this responsibility and to provide a list of those people who need to be notified directly interferes with IPAS' ability to carry out this responsibility. . . .

Plaintiff's Brief In Support Of Plaintiff's Motion For Contempt at 2-3. The court concludes, however, that this argument is as overblown as IPAS's argument that paragraph 5 of the Final Order somehow requires the disclosures that IPAS demands.

The fact that 42 C.F.R. § 51.42(e) imposes a specific duty on IPAS in no way explicitly, or even implicitly, imposes a concomitant duty upon Gerard to provide the information "necessary" for IPAS to meet its notification obligation under the regulation. First, there is no reference whatsoever in the regulation to disclosure of information by an institution, or even to a right of access on the part of an advocacy agency to the information in question held by an institution, so that the advocacy agency can fulfill its notification obligation. In contrast, where Congress intended an advocacy agency to have access to certain information to fulfill its obligations, it said so. *See, e.g.,* 42 U.S.C. § 10805(a)(4) (defining an advocacy agency's right of access to records of persons with mental illnesses); 42 U.S.C. § 15043(a)(2) (defining an advocacy agency's right of access to records of persons with developmental disabilities). Second, IPAS has made no showing that it is without other sources of the information that it demands. This is so, even assuming that such information is "necessary" for IPAS to comply with 42 C.F.R. § 51.42(e), which the court doubts, or that other means of notifying parents, guardians, or legal representatives that IPAS will be conducting monitoring functions at Gerard are not reasonably available,

23

even without a disclosure of lists of residents and the names of their legal guardians or representatives. IPAS may be able to obtain the requested information from the State of Iowa, as Gerard suggests—IPAS has made no showing to the contrary. Furthermore, Gerard's suggestion that IPAS provide Gerard with information (in the form of an information packet, brochure, or letter, for example) about the possibility that IPAS will be conducting "monitoring" activities at Gerard's facility, which *Gerard* would, in turn, send to parents, legal guardians, and legal representatives, is not a patently unreasonable way for IPAS to meet its obligation to "make every effort to ensure that the parents of minors or guardians of individuals in the care of a facility" receive information about IPAS's monitoring activities. *See* 42 C.F.R. § 51.42(e). In short, the court cannot find that 42 C.F.R. § 51.42(e), and hence paragraph 1 of its Final Order requiring access to records "as provided by federal law," requires the disclosures that IPAS has demanded and that Gerard has refused to provide.

IPAS, however, argues that there are dire policy implications of not reading into the regulation a duty on the part of an institution to disclose to an advocacy agency the information necessary for the advocacy agency to fulfill its notification obligation. IPAS points out that what is at issue here is not just IPAS's access to the information in question from Gerard, but access to such information from all of the many institutions that fall within the range of IPAS's and every other advocacy agency's monitoring activities. IPAS argues that it could not have been the intent of Congress (or the federal agency that promulgated 42 C.F.R. § 51.42(e) pursuant to statutory mandates) that an advocacy agency would have to try to figure out some way to get the information necessary to fulfill its notification obligation from some place other than the institution being monitored. For example, while Gerard contends that, *in this case*, the State may have the information that IPAS requires, where most of Gerard's residents are referred there by the State, that might not be the case for many other institutions, such as schools or other care facilities. If IPAS can't get the

24

information it needs from the institutions themselves, IPAS contends that Congress's intent is frustrated. Moreover, requiring IPAS to satisfy its notification obligation by passing information through Gerard puts IPAS in the position of revealing to the institution that IPAS intends to conduct monitoring activities, which is not required by governing law; could suggest to recipients of the information that there is an association between Gerard and IPAS that does not exist; and would place Gerard in a position of monitoring the content of IPAS's notifications and even whether they were sent at all.

The court acknowledges the appeal—and appealability—of some of IPAS's policy-based arguments. However, as to IPAS's last objection to Gerard's proposed scheme of meeting IPAS's notification obligation by passing information *through Gerard*, the court notes that the terms of the Final Order do not require instant access, or access without notice, to Gerard's facilities or its records for "monitoring" purposes. Instead, the Final Order requires access for monitoring and other activities "[w]ithin twenty-four hours of written request for access, which shall identify the purpose of such access." Final Order at ¶ 5. Moreover, a notice on any notification from IPAS passed through Gerard stating that such notification is provided "pursuant to federal law" would minimize or eliminate any suggestion that there is an association between Gerard and IPAS. Also, an arrangement under which Gerard would pass on the notifications would not give Gerard the right to monitor the *content* of IPAS's notifications, either by demanding changes or by refusing to pass on the notifications. Although it may not be necessary for the court to decide the issue for purposes of resolving IPAS's motion for contempt, the court must also agree with Gerard that the regulation imposing the notification obligation on IPAS *does not*, by its plain terms, require notification *every time* that IPAS is going to conduct "monitoring" activities. Rather, the portion of the regulation requiring notification "that the system will be monitoring activities at the facility and may in the course of such monitoring have access to the minor or adult with a legal guardian," *see* 42 C.F.R. § 51.42(e), seems to the court

25

to suggest that a general notice to that effect would be sufficient.

More generally, in the court's view, IPAS's policy-based arguments simply do not create an obligation to disclose on Gerard's part, where no such obligation can be gleaned from the language of the regulation or the statutory scheme that the regulation was intended to serve. Other courts—even the Court of Appeals in this case—may take a different view, but it seems to this court that the lacuna in the statutes and regulations that impose upon IPAS an obligation to notify without a concomitant obligation on institutions to provide the information necessary for IPAS to make the required notification cannot be filled by judicial fiat, and certainly cannot be filled from any "judicial interpretation" of the regulation that would not be so strained as to amount to impermissible judicial redrafting.

More to the point, however, *in the context of a motion for contempt*, the court concludes that IPAS's argument that the interplay between paragraph 1 of the Final Order, and the language of 42 C.F.R. § 51.42(e) requires the disclosures that IPAS demands is so strained that the "alleged contemnor could 'reasonably, even if perhaps erroneously, have believed' that [its] conduct was permitted by the underlying order," and indeed, permitted by the regulation upon which IPAS relies, such that a finding of contempt would be an abuse of discretion. *Imageware, Inc.*, 219 F.3d at 797. Therefore, IPAS has once again failed to demonstrate that a finding of contempt premised on Gerard's supposed violation of paragraph 1 of the Final Order—and more specifically, violation of 42 C.F.R. § 51.42(e), as incorporated into the Final Order by paragraph 1—is appropriate. *Id.*

**ii. *Incorporation of 42 U.S.C. §§ 10805 and 15043*.** In its February 11, 2003, letter, IPAS also contended that 42 U.S.C. § 15043 and 42 U.S.C. § 10805 somehow require the requested disclosures by Gerard. Again, if these statutory provisions require Gerard to make the requested disclosures, then, by virtue of paragraph 1, so does the Final Order. *See* Final Order at ¶ 1 (enjoining Gerard "from preventing or interfering with IPAS's access, *as provided by federal law*, to residents, *records of residents*, and facilities located

26

at Gerard in Mason City, Iowa") (emphasis added). However, the court concludes that IPAS's reliance on these two statutes as imposing on Gerard a duty to disclose the information in question is also misplaced.

Section 10805 does authorize access by an advocacy agency to records of any individual *with a mental illness*, which might arguably include the names of residents of an institution for the mentally ill and the names and addresses of legal guardians or representatives of those residents. However, the statute provides the advocacy agency with access to records *only* of certain persons: (1) a person who is *a client of the system* or whose legal representative has authorized the advocacy agency to have such access, *see* 42 U.S.C. § 10805(a)(4)(A); (2) any individual who cannot authorize the advocacy agency to have such access, has no legal representative, or whose legal representative is the State, *and with respect to whom a complaint has been received by the advocacy agency or with respect to whom, as a result of monitoring or other activities, there is probable cause to believe that the individual has been subject to abuse or neglect, see* 42 U.S.C. § 10805(a)(4)(B); or (3) any individual who has a legal representative, *with respect to whom a complaint has been received or a probable cause determination has been made,* and the representative has been contacted by the advocacy agency, been offered the agency's assistance, but has "failed or refused to act." *See* 42 U.S.C. § 10804(a)(4)(C). These provisions plainly do not require disclosure of the names of the residents, or the names of their guardians or representatives, where no complaint or probable cause determination has been made about the residents *unless* a resident is a client of the advocacy agency. Moreover, although these provisions require disclosures *on the basis of a probable cause determination as a result of monitoring by the advocacy agency*, these provisions do not require disclosures *for purposes of notification of the possibility of monitoring by the advocacy agency*; indeed, they are silent about any access to records for "monitoring" purposes. The authority for access to records under 42 U.S.C. § 15043, for persons with

27

*developmental disabilities*, is under essentially the same conditions. *See* 42 U.S.C. § 15043(a)(2)(I). Again, IPAS has relied exclusively on its obligation to inform legal guardians that it will be performing "monitoring" functions as the basis for its right to receive the information in question. IPAS has not asserted that it is pursuing, under its "investigative" authority, access to records in the course of an investigation of a complaint, death, or probable cause determination.

It follows that neither statutory provision supports IPAS's demand for the names of residents or the names and addresses of residents' legal guardians or representatives in the circumstances presented here. Accordingly, even though paragraph 1 of the Final Order requires compliance with these statutes, IPAS has failed to show that these statutes, as incorporated into the Final Order by paragraph 1, command or compel the disclosures that IPAS is demanding. *See I.B.E.W.*, 293 F.3d at 418 (the movant must show that the order clearly and specifically requires the action that the alleged contemnor has failed to take, for example, by "operative command" or language "compelling" certain action). Thus, Gerard cannot be held in contempt of court for refusing to disclose the requested information on the basis of any supposed violation of these statutes as incorporated into the Final Order by paragraph 1. *Id.*

### 3. Summary

IPAS has failed to carry its initial burden to show that Gerard violated clear and specific terms of a court order requiring the disclosures in question. *See e.g., I.B.E.W.*, 293 F.3d at 418 ("[C]ontempt orders must be based upon a party's failure to comply with a clear and specific underlying order."); *see also Chicago Truck Drivers*, 207 F.3d at 504 ("The party moving for contempt sanctions bears the burden of proving facts warranting a civil contempt order by clear and convincing evidence."). In these circumstances, the court finds it unnecessary to reach IPAS's arguments that any state-law bars to disclosure are preempted. The court also finds it unnecessary to determine whether any supposed violation

28

of the terms of the Final Order by Gerard can presently be remedied or if compliance is, instead, impossible. *See Santee Sioux Tribe*, 254 F.3d at 736 ("Once it has been shown that the alleged contemnors violated a court order, the contemnor bears the burden of showing that compliance is presently impossible.").

## IV.  CONCLUSION

The court concludes that, far from Gerard being in contempt of this court's Final Order, it is IPAS that has misconstrued what this court's Final Order, applicable statutes, and applicable regulations require.  IPAS has failed to demonstrate, by clear and convincing evidence, that Gerard failed to comply with clear and specific terms of this court's Final Order requiring Gerard to produce a list of the residents of the institution along with the names and addresses of the residents' respective guardians or other legal representatives to aid IPAS in notifying such guardians or representatives of the possibility that IPAS might conduct "monitoring" activities.  Indeed, the court finds that not only are there no terms in the Final Order that could reasonably be construed to require any such disclosures, IPAS has failed to identify any terms of a statute or regulation that require such disclosures.

THEREFORE, IPAS's June 30, 2003, motion (docket no. 35) for contempt of the June 14, 2002, Final Order is **denied**.

**IT IS SO ORDERED.**

**DATED** this 4th day of August, 2003.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

29